# SEALED



ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG 22 2023

CLERK, U.S. DISTRICT COURT
By_____
Deputy

UNITED STATES OF AMERICA

v.

No. 4:23-MJ- 613

MARIO LARA (01)
KYRON MCGRAW (02)
GAVINO TRUJILLO (03)
ORALIA CARRIZALES (04)
GEOVANNY GARCIA (05)
    a/k/a "Jeovanny Enriqu Garcia-Vanegas"
DARRYL FOX (06)
GUADALUPE CORONA (07)

## CRIMINAL COMPLAINT

I, the undersigned complainant, being duly sworn state the following is true and correct to the best of my knowledge and belief:

### I. Alleged Offense

From in and about November 2021 thru in and about July 2022, in the Fort Worth Division of the Northern District of Texas and elsewhere, defendants **Mario Lara, Kyron McGraw, Gavino Trujillo, Oralia Carrizales, Geovanny Garcia, Darryl Fox, Guadalupe Corona,** and others known and unknown, willfully combined, conspired, confederated, and agreed to commit certain offenses against the United States, in that, the defendants and others conspired to violate 18 U.S.C. § 922(a)(6), to wit: the defendants and others conspired to knowingly make false and fictitious material statements to licensed firearm dealers in connection with the acquisition of firearms, all in violation of 18 U.S.C. § 371 (18 U.S.C. § 922(a)(6)).

### II. Experience and Background

1.      I, Kyle Medvetz (affiant), being duly sworn, depose and swear the following information is true and correct to the best of my knowledge and belief. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since March 2020. I am currently assigned to the Dallas Field Division office. I have prior experience working interstate firearms trafficking investigations. Through those investigations, I have learned trends that indicate firearms trafficking or straw purchasing.

Criminal Complaint – Page 1

2.    As an ATF Special Agent, my primary responsibilities are enforcing federal firearms laws as set forth in the United States Code, including the following violations pertaining to this investigation: 18 U.S.C. § 922(a)(6) False Statement to a Federal Firearms Licensee (straw purchase); 18 U.S.C. § 924(a)(1)(A), False Statement on Federal Firearms Licensee Records; and 18 U.S.C. § 922(g)(5)(A), Possession of a Firearm by an Alien Illegally and Unlawfully Present in the United States. I have conducted numerous federal investigations of criminal activity and have testified in federal court numerous times concerning a wide variety of federal criminal violations including the aforementioned violations. I have conducted numerous debriefings of defendants, witnesses, informants, and other persons concerning the aforementioned and related violations.

3.    This affidavit is based on my personal knowledge and on information provided to me by other law enforcement officers who participated in this investigation. Since this affidavit is being submitted for the limited purpose of supporting a criminal complaint, I have not included each and every fact known to me concerning this investigation.

4.    In my training and experience, I know that Section 923(g) and Title 27, Code of Federal Regulations (CFR), Part 478, require licensees to maintain records of importation, production, shipment, receipt, sale, or other disposition of firearms at the place of business. These records include the "ATF Form 4473 Firearms Transaction Record," which is used to transfer a firearm from a licensee to a non-licensee, and a copy of the ATF Form 3310.4, Report of Multiple Sales, for the disposition of more than one handgun to a non-licensee during a period of five business days.

5.    In my training and experience I know that, when an individual, a non-licensee, wants to purchase a firearm from an FFL they are required to complete an ATF Form 4473 before the transfer of a firearm. This form requires basic information such as the individual's name, date of birth, current address and other identifiable information. The individual then answers a series of disqualifying questions that would prohibit them from obtaining or possessing a firearm. Some of these questions ask whether the individual is a felon, under indictment for a felony offense, an alien illegally unlawfully present in the United States, or the user of a controlled substance. In addition, one of the disqualifying questions on the ATF Form 4473 is whether the individual is the actual transferee/buyer of the firearm, and it explains that a person is not the actual transferee/buyer if they are acquiring the firearm on behalf of another person.

6.    In my training and experience, I know that is considered a straw purchase and a violation of 18 U.S.C. § 922(a)(6) and 18 U.S.C. § 924(a)(1)(A), if an individual purchases a firearm from an FFL on behalf of another person, while marking on the ATF Form 4473 that they are the "actual transferee/buyer." I also know that it is a common method of firearm trafficking

organizations to recruit individuals who are legally authorized to purchase firearms to make straw purchases of firearms.

## III. Overview of Conspiracy

7.    As explained more fully below, through the course of this investigation, your affiant was made aware of a firearms trafficking conspiracy, by which, previously-charged defendant and illegal alien Jose Rivas-Chairez, and others, recruited multiple individuals to straw-purchase or otherwise acquire firearms on his behalf, to include **Mario Lara, Kyron McGraw, Gavino Trujillo, Oralia Carrizales, Geovanny Garcia, Darryl Fox,** and **Guadalupe Corona.** With the exception of **Geovanny Garcia,** who is also an illegal alien, these individuals were otherwise legally authorized to purchase firearms.

8.    It was part of the manner and means of this conspiracy for **Mario Lara, Kyron McGraw, Gavino Trujillo, Oralia Carrizales, Darryl Fox, Guadalupe Corona,** and others to straw purchase multiple firearms from FFLs on Rivas's behalf, while marking on the ATF Form 4473s that they were the actual transferee/buyer of the firearms.

9.    It was on object of this conspiracy for the firearms to be transported out of the United States to Mexico. Rivas was determined to have disassembled the firearms, concealed them in plastic and towels, and shipped them to Mexico by parcel or concealed inside tires.

10.    As illustrated more fully below, by my estimate, over 100 firearms were sent to Mexico by Rivas, with a majority of those firearms being acquired by **Mario Lara, Kyron McGraw, Gavino Trujillo, Oralia Carrizales, Geovanny Garcia, Darryl Fox,** and **Guadalupe Corona.**

## IV. Probable Cause

### A. Inception of the Investigation

11.    In July of 2022, your affiant and another ATF Special Agent were made aware of purchases of two FN, model Scar 17s, .308 caliber rifles by an uncharged coconspirator on June 3 and June 6, 2022, from Range USA, a Federal Firearms Licensee (FFL) located at 5661 South Cooper Street Arlington, Texas 76017. The uncharged coconspirator purchased each rifle for $4,005.24, for a combined total of $8,010.48. During the interview with the uncharged co-conspirator, your affiant was told the firearms were purchased at the request of Ana Francisco-Sotelo and Jose Rivas-Chairez (both previously convicted under case no. 4:22-CR-288-P).

12.    On or about July 27, 2022, a Range USA employee told your affiant of a purchase of an FN, model SCAR 20S, 7.62x51mm NATO rifle, bearing serial number PR15071 by a **Mario**

Criminal Complaint – Page 3

Lara. During this transaction, **Lara** overpaid for the firearm by $100. A Range USA employee contacted **Lara**, advised him of the overpayment, and **Lara** returned to retrieve the $100. Your affiant reviewed surveillance video from Range USA which showed **Lara**, seen below in *Figure 1* wearing the gray shirt, with Jose Rivas-Chairez, who is wearing a black shirt, along with a third individual, inspecting an FN SCAR rifle *(Figure 1)*. Minutes later, **Lara**, now carrying the purchased FN SCAR rifle, is seen standing next to Rivas at the register *(Figure 2)*.



Figure 1    Figure 2

13.    Subsequently, ATF Special Agents identified a firearms trafficking network headed by Jose Rivas-Chairez (Rivas), with assistance from Rivas's girlfriend, Ana Francisco-Sotelo (both previously convicted under case no. 4:22-CR-288-P). At all times relevant to this investigation, Rivas and Sotelo were not citizens or nationals of the United States and were aliens illegally and unlawfully present in the United States.

14.    On or about July 29, 2022, your affiant and additional ATF Special Agents went to 310 Mahogany Drive Arlington, Texas 76018, Rivas and Sotelo's residence, in an attempt to interview Rivas and Sotelo. Eventually, Rivas and Sotelo exited the house and were interviewed by ATF Special Agents.

15.    During an audio recorded non-custodial interview between ATF Special Agents, your affiant, and Rivas, Rivas admitted to directing multiple individuals, including an uncharged coconspirator, **Lara**, and **Guadalupe Corona** to purchase firearms on Rivas's behalf. During the interview, Rivas mentioned buying a holster for a 1911 style pistol. Your affiant asked Rivas if the firearm was in the house, and Rivas stated it was not. Rivas stated he purchased the Remington from a friend. Your affiant asked, "So not at a gun store?" To which Rivas replied, "No sir, I'm

not legal to be honest to be buying a gun." Your affiant asked, "So you are not a United States citizen?" Rivas replied, "No sir." Your affiant asked, "What country do you have citizenship with?" Rivas replied, "Mexico." Rivas also said he currently had eight (8) Glock pistols inside of the residence. Your affiant requested to search Rivas's residence, to which Rivas provided consent to search his residence both verbally and in writing.

16.    During Sotelo's interview, Sotelo admitted to directing an uncharged coconspirator to purchase two FN SCAR rifles for Rivas.  Sotelo also showed ATF SAs the communication between her and the uncharged coconspirator where she directed the uncharged coconspirator on where/what/how to purchase the firearms. Sotelo also admitted to not being a United States citizen, but rather a Mexican citizen. Sotelo told ATF Special Agents that Rivas provided money and direction to an uncharged coconspirator regarding which firearms to purchase and where to purchase them from. Sotelo, without being asked, said Rivas sent the firearms purchased by an uncharged coconspirator to Mexico and added they may have been shipped via Fedex.

17.    Your affiant, another ATF Special Agent, and Rivas then walked through each room of 310 Mahogany Drive, and Rivas identified every place firearms, ammunition, firearm related items, and illicit narcotics were stored. In the master bedroom of 310 Mahogany Drive, where Rivas and Sotelo were residing, Rivas showed your affiant where a Remington, model 1911 R1, .45 caliber pistol bearing serial number RHE0078 was stored in a dresser drawer, loaded with eight (8) rounds of .45 caliber ammunition. In this same drawer, a receipt dated July 18, 2022, from Cash Plus Pawn at 4400 Matlock Road Arlington, Texas 76018, detailing the purchase of three Glock firearms was recovered *(Figure 3)*. The purchaser of the three Glock firearms was listed at **Kyron McGraw**. Tucked in between Rivas's bedframe and bed was a Glock, model 19X, 9x19mm caliber pistol with serial number BWZW084 which was purchased by **McGraw** from an FFL. A "Firearm Return Policy/Disclaimer" from Academy Sport and Outdoors, signed by **McGraw**, was located in the master bedroom portion of the residence (*Figure 4). A* ledger documenting dollar amounts and names was also located in the master bedroom portion of the residence (*Figure 5)*.



*Figure 3*          *Figure 4*          *Figure 5*

18.     In the foyer of the residence two duffle bags were located. Rivas said the bags contain three disassembled FN SCAR rifles. While searching the bags, a suppressor was located. When asked, Rivas admitted to knowing the suppressor makes gunshots quieter. Your affiant later determined the suppressor was stolen. The second duffle bag was searched and ATF Special Agents found nine (9) Glock pistols of various models and one (1) Colt pistol *(Figure 6)*. All of the items were wrapped in towels and/or plastic wrap. Approximately eighteen (18) firearms were recovered from the residence. Eight (8) of those firearms, six of pistols and two of the FN SCAR rifles shown in *Figure 6*, were purchased later determined to be purchased by **McGraw** from an FFL.


*Figure 6*

19.     Throughout the residence, in excess of one hundred empty firearm boxes were located. Rivas stated the firearms that were once in those boxes were no longer present in the house. Of note were four empty boxes with identifying markings to the following firearms: an FN, model SCAR 17S, 7.62x51mm NATO rifle, bearing serial number H1C11871; an FN, model SCAR 20S, 7.62x51mm NATO rifle, bearing serial number PR22565; and an FN, model SCAR 17S, 7.62x51mm NATO rifle, bearing serial number H1C12232; an FN, model SCAR 17S, 7.62x51 NATO rifle, bearing serial number H0C27133. The first two SCAR rifles associated with the above-listed boxes were later determined to have been purchased by **Gavino Trujillo** from an FFL. The latter two SCAR rifles associated with the above-listed boxes were later determined to have been purchased by an uncharged coconspirator.

20.     In a closet in the downstairs portion of the residence, ATF Special Agents located a majority of the firearm boxes, mostly of Glock manufacture *(Figure 7)*. None of the boxes contained actual firearms, but the boxes were affixed with a factory label containing the make, model, serial number of the firearm associated with the box. Approximately forty nine (49) of the firearm boxes at the residence once contained firearms purchased from FFLs by **Oralia Carrizales**.



*Figure 7*

21.     In a downstairs room, ATF SAs located a white substance suspected to be methamphetamine *(Figure 8)*. In this same room was a device to remove a tire from a rim (seen in red in *Figure 8*), and a rim attached to a tire. Rivas stated the tire once contained kilograms of methamphetamine which he sold prior to your affiant's arrival. Rivas directed ATF SAs to additional trash bags stored on the side of the residence where numerous empty bags with a white residue were located. Rivas stated these empty bags once contained kilograms of methamphetamine and were previously stored in a separate tire. Later, your affiant inspected each narcotics package that was recovered and found forty nine (49) packages to contain a visible amount of a white crystal substance which tested positive for methamphetamines. Some of the packages are seen below in *Figure 9*.



*Figure 8*                    *Figure 9*

22.     In total, in excess of one hundred and fifty-one (151) firearm boxes were observed throughout Rivas and Sotelo's residence. E-Trace results of the boxes and firearms identified some of the purchasers as **Oralia Carrizales** (49 associated firearm boxes), **Kyron McGraw** (11 associated firearm boxes), **Darryl Fox** (6 associated firearm boxes), **Guadalupe Corona** (5 associated firearm boxes), **Gavino Trujillo** (5 associated firearm boxes), **and Mario Lara** (1 associated firearm box and 1 firearm).

23.     In October of 2022, your affiant conducted a proffer with separately charged cooperating defendant (CD). During the proffer, the CD explained how Rivas trafficked narcotics into the United States from Mexico and firearms from the United States to Mexico. The CD said the firearms were smuggled in tires, and some of the narcotics were smuggled in tow behind car haulers *(Figure 10)*. Your affiant presented the CD with a picture of a slashed tire with a blue object seen inside. The CD explained the blue object inside is a firearm that was wrapped for transport *(Figure 11)*.



*Figure 10*          *Figure 11*

24.     In May of 2023, your affiant conducted a proffer interview with Jose Rivas-Chairez. During the interview, Rivas confirmed **Mario Lara**, **Kyron McGraw**, **Gavino Trujillo**, **Geovanny Garcia**, **Darryl Fox**, and **Guadalupe Corona** knowingly purchased firearms for him at his request. Rivas confirmed when discussing "toys" with **Garcia**, they were actually referring to firearms. Your affiant found videos on Jose Rivas's phone of suspected firearms, wrapped the same way as those recovered from his residence, stored inside of a tire *(Figure 12)*.



*Figure 12*

**B. Oralia Carrizales and Geovanny Garcia**

25.     Prior to the search of Rivas's residence, in May of 2022, your affiant was made aware of a large number of firearms purchased by **Oralia Carrizales**, with most of the transactions occurring in multiple sales of Glock pistols. From December 1, 2021, until May 21, 2022, your affiant identified a total of seventy-seven (77) firearms purchased by **Carrizales**. During a review of the ATF Form 4473s and communication with FFLs that **Carrizales** purchased firearms from, your affiant was able to identify two phone numbers associated with **Carrizales**: 817-812-8773 and 682-364-9061.

26.     On or about May 24, 2022, your affiant and another ATF SA conducted a recorded, non-custodial, interview of **Carrizales** at her residence, on Mayfield Villa Drive in Arlington, Texas 76014. ATF SAs knew **Carrizales** had previously purchased a Kimber, model Hero Custom, .45 caliber pistol bearing serial number K835350, and asked **Carrizales** if that was the only firearm she owned. Carrizales replied, "Ya." An ATF SA asked **Carrizales** if she purchased other firearms in addition to the Kimber. **Carrizales** stated she tried to, but the transaction did not go through. The ATF SA asked where this transaction took place. **Carrizales** began to say she went to a small shop but changed her statement to say "we" went to a gun show. When asked what she meant by "we," **Carrizales** stated her husband, **Geovanny Garcia**. The ATF SA asked **Carrizales** when the last time she purchased a firearm was, and **Carrizales** said she could not remember. The ATF SA asked the question again, and **Carrizales** again replied, "I honestly can't remember. Probably last weekend." Your affiant knew **Carrizales** purchased two Glock pistols from an FFL just three days prior on May 21, 2023. When asked, **Carrizales** said she purchased two Glock pistols from a gun show and that she was alone when she purchased them. When asked if she still possessed the firearms, **Carrizales** said she did not, adding she gave them to a friend. ATF SAs asked Carrizales if any of the firearms were still in her house, **Carrizales** said they were not because she no longer had them. **Carrizales** stated she purchases firearms to resell them, earns between $50-60 per firearm, and has sold approximately 50-60 firearms.

27.     During the interview, your affiant asked **Carrizales** what her phone number was, and she provided "817-812-8773," referenced above. Your affiant asked if **Carrizales** knew of a phone number starting in "682", and she said the phone number was probably an old one. Your affiant rebutted, and said she used the phone number just five days prior to contact an FFL she purchased a firearm from. **Carrizales** said the phone number is also hers, but when asked where the phone was, she said it was probably dead inside of her car. When ATF SAs began to confront **Carrizales** about the numerous lies and inconsistencies in the answers she was providing, **Carrizales** stated she was not lying, and began to request an attorney. Soon thereafter, ATF SAs stopped questioning **Carrizales**, provided their contact information to her, and asked she contact them if she wanted to explain who the firearms were sold to.

28.     Firearm E-Trace results of boxes recovered from Rivas's residence showed forty-nine (49) firearms, of which 48 were Glock pistols and one was a Beretta pistol, were purchased by **Oralia Carrizales**. Of note, the boxes belonging to the two firearms **Carrizales** admitted to purchasing at the gun show on or about May 21, 2022, were among those recovered from Rivas's residence.

29.     In August of 2022, a United States Magistrate Judge for the Northern District of Texas signed a search warrant authorizing the search of four cellular devices found in the possession of Rivas and Sotelo. A blue iPhone removed from Rivas's person by your affiant was searched, and a WhatsApp chat between **Geovanny Garcia (Carrizales**'s spouse) and Rivas was found. Within the messages, **Garcia** discussed delivering "toys" to Rivas and pricing in the thousands of dollars for the "toys." The deliveries of the "toys" occurred soon after **Carrizales** had made purchases of firearms. Rivas directed **Garcia** to meet him at Rivas's residence to exchange the "toys" and also mentioned meeting at a park. Rivas mentioned allowing **Garcia** to exchange the "toys" by meeting with Rivas's cousin, whom your affiant has identified as a separately-charged cooperating defendant (CD). On May 19, 2022, Rivas messaged **Garcia** and asked **Garcia** to call him. **Garcia** replied that he needed to pay his cell phone because it is disconnected. Rivas texted **Garcia** about a Beretta and asked for pictures. **Garcia** texted Rivas pictures of a Beretta, model 92FS INOX, 9mm caliber pistol, with serial number A299456Z. The serial number is clearly visible in the pictures *(Figure 13)*.



*Figure 13*

30.     A trace of the firearm showed it was purchased by **Carrizales** (**Garcia**'s spouse) during a multiple sale on May 17, 2022, from an FFL located in Dallas, Texas *(Figure 14)*. Rivas (below in green) asked **Garcia** (below in blue) how much **Garcia** would charge Rivas for the firearm *(Figure 15)*.

*Figure 14*



*Figure 15*

31.     Your affiant obtained toll records for phone numbers associated with **Garcia** (817-812-8773) and **Carrizales** (682-364-9061). For phone number 817-812-8773, **Garcia** was listed as the subscriber. For phone number 682-364-9061, **Carrizales** was listed as the subscriber. Between February 14 and May 22, 2022, the phone numbers contacted one another approximately 580 times. Between April 16 and June 20 of 2022, only **Garcia's** phone number (817-812-8773) communicated with Rivas's phone number, doing so approximately 471 times. Of note, none of the recovered firearm boxes purchased by **Carrizales** were purchased prior to April 18, 2022. Both phone numbers contacted numerous FFLs, to include those **Carrizales** purchased firearms from. On occasion, both phone numbers were contacting FFLs on the same day within minutes of each other.

32.     In October of 2022, your affiant conducted a proffer interview with the separately charged cooperating defendant (CD) described above.  During the interview, the CD identified **Garcia** and **Carrizales** as supplying Rivas and the CD with firearms.  The CD stated that sometimes Rivas would give **Garcia** and **Carrizales** the money to purchase the firearms or sometimes they would use their own money to purchase the firearms and be reimbursed by Rivas. The CD stated that when **Garcia** and **Carrizales** were purchasing firearms for Rivas, the CD would meet with **Garcia** and **Carrizales** multiple times per week to pick up various firearms.  Consistent with the above-described communications between Rivas and **Garcia**, the CD stated he would normally meet with **Garcia** and **Carrizales** in a park near 310 Mahogany Drive to transfer the firearms.

33.     On or about January 17, 2023, your affiant obtained a search warrant for an iCloud account associated with **Carrizales**. A review of the information supplied by Apple for the account found multiple pictures of **Garcia** holding what appeared to be a Glock pistol with a silencer attached to the barrel *(Figure 16)*. Another picture showed **Garcia** holding a similar firearm without a silencer attached but with a red "thread protector" attached to the end of the muzzle *(Figure 17)*.



*Figure 16*          *Figure 17*

34.    In February of 2023, your affiant obtained a search warrant for an iCloud account associated with **Garcia**. A review of the information supplied by Apple for that account found the same picture of **Garcia** holding the Glock pistol with a silencer attached to the barrel. Screens shots of various FFL contact information and gun shows was found. In **Garcia's** text chat with Rivas, found on Rivas' phone, **Garcia** sent Rivas a video of multiple firearms and ammunition displayed on top of a table *(Figure 18)*. A picture that included a table with a similar pattern was found on **Garcia's** iCloud account *(Figure 19)*. A picture of the firearm in *Figure 18* was found on Rivas' phone in a chat between Rivas and an individual who was directing Rivas to purchase certain firearms.



*Figure 18*          *Figure 19*

35.    A video of the steering wheel/dashboard area of a vehicle with a date of May 21, 2022, was also found. The infotainment area/screen is observed in the video and appears to be the same as the Toyota Camry owned by **Garcia** and **Carrizales** when compared to other pictures of the infotainment area/screen found on **Garcia's** iCloud account. As the video pans around the steering wheel of the vehicle, a Colt 1911 style pistol is observed in a holster affixed

underneath the steering wheel *(Figure 20)*. This Colt 1911 style pistol is similar to the Colt, model Defender, 1911 style pistol **Garcia** offered to sell to Rivas on or about May 19, 2022, in their text chat *(Figure 21)*.



*Figure 20*                     *Figure 21*

36.     In May of 2023, your affiant attended a proffer interview with Rivas. During the interview, Rivas identified **Garcia** and **Carrizales** as being part of a greater firearms trafficking network. Rivas explained that "toys" was a code word for firearms. Rivas explained two ways in which he conducted business with **Garcia** and **Carrizales**:

i.     During some of the interactions, **Garcia** and **Carrizales** would bring Rivas firearms at the direction of an unidentified third party. **Garcia** and **Carrizales** would transfer these firearms to Rivas, and Rivas would transfer them to an unknown party. The unidentified third party would pay Rivas between $100 to $150 for these transfers.

ii.     The second type of transaction Rivas conducted with **Garcia** and **Carrizales** were for Rivas's direct financial benefit. During these transactions, Rivas negotiated with **Garcia** to purchase firearms from **Garcia** and **Carrizales**. When Rivas, **Garcia**, and **Carrizales** met in person to transfer these firearms, Rivas gave **Garcia** cash for them. Rivas said after he handed **Garcia** the money, **Garcia** would hand the money to **Carrizales** who would count it. Rivas said only cash was used to purchase the firearms and never a web-based money application like Zelle or Venmo.

37.     On or about July 3, 2023, an Immigration and Customs Enforcement Officer informed your affiant that **Garcia** is not a legal residence of the United States of America. **Garcia** is a resident of Honduras, and currently has an active order of deportation associated with the name Jeovanny Enriqu Garcia-Vanegas. Accordingly, as an alien illegally and unlawfully present in the United States, it is a federal felony offense for **Garcia** to possess a firearm under 18 U.S.C. § 922(g)(5).

38.     For each of the firearm boxes recovered from Rivas's residence for which **Carrizales** was determined to be the purchaser, a review of the corresponding ATF Form 4473 showed **Carrizales** marked the box indicating she was the actual purchaser of the firearm, the firearm was not being purchased for someone else, and she signed the ATF Form 4473. *Figure 22*

is a picture of a firearm box found at Rivas's residence which traced back to **Carrizales**, and *Figure 23* is a page of the ATF Form 4473 **Carrizales** completed for that purchase.



*Figure 22*



*Figure 23*

39.    From November 2021 to July 2022, ATF is aware of at least eighty-eighty (88) firearms purchased by **Carrizales** from an FFL. However, this number may be incomplete because it would not account for unrecovered firearms or firearms purchased from a private seller.

## C. *Kyron McGraw*

40.    E-Trace results of boxes and firearms recovered from Rivas's residence showed **Kyron McGraw** purchased sixteen (16) Glock pistols and three (3) FN SCAR rifles for Rivas. Six (6) of these Glock pistols were recovered from Rivas's residence along with two (2) of the FN SCAR rifles. An additional Glock pistol was found to have been purchased by **McGraw**, but neither the firearm nor the box was found at Rivas's residence.

41.    During the search of Rivas's residence, ATF SAs located seven firearms, purchased by **McGraw**, which were in various states of disassembly and packaged with towels and cellophane wrap in a manner that would protect them while being trafficked. ATF SAs also located a receipt dated July 18, 2022, from Cash Plus Pawn at 4400 Matlock Road Arlington, Texas 76018, detailing the purchase of three Glock firearms. The purchaser was listed as **McGraw** and the boxes to those three firearms were found inside the residence.

42.    On or about August 1, 2022, during a recorded, post-Miranda, custodial interview of Rivas, he described one of his suppliers of firearms as a tall (over six foot), black male, with "messy" hair. Rivas stated the last time he met this individual, the individual was driving a silver Nissan Altima. Rivas believed the list of firearms found in the master bedroom dresser drawer next to his 1911 pistol was a list of some of the firearms purchased by this individual. At the time, your affiant did not have a picture or information for **McGraw** so that Rivas could identify his picture, but the physical characteristics described by Rivas matched **McGraw**.

43.    On or about August 5, 2022, your affiant received a still image from surveillance video showing **McGraw** purchasing the FN, model SCAR 20s, 7.62x51mm caliber rifle, with serial number PR19567 from The Gun Zone, an FFL located in Mesquite, Texas on July 22, 2022 *(Figure 24)*. This rifle was recovered from Rivas's residence. According to the information **McGraw** wrote on the ATF Form 4473 and a surveillance image of **McGraw** taking possession of the purchased rifle, **McGraw** is a black male with messy afro style hair, 6'2" tall, and weighs 340 lbs.



*Figure 24*

44.    Your affiant also reviewed **McGraw's** Texas Workforce Commission report, which showed for the first, second, and third quarters of 2022, **McGraw** earned a mere $3,974.84. The total purchase price for the rifle **McGraw** bought from The Gun Zone was $4,329.98, and their records indicate **McGraw** paid $4,400 in cash.

45.    During the October 2022 interview with the above-described CD, the CD identified **McGraw** as an individual who purchased firearms for the CD and Rivas. The CD said Rivas gave **McGraw** money and told him which firearms to purchase.

46.    During the May 2023 interview with Rivas, Rivas identified **McGraw** as an individual who purchased firearms for him. Rivas said he did not give **McGraw** money to purchase the firearms, but did ask **McGraw** to purchase Glock pistols and FN SCAR rifles for him.

47.    For each of the firearms and/or boxes recovered from Rivas's residence for which **McGraw** was determined to be the purchaser, a review of the corresponding ATF Form 4473 showed **McGraw** marked the box indicating he was the actual purchaser of the firearm, the firearm was not being purchased for someone else, and he signed the ATF Form 4473. *Figure 25* is a picture of a firearm box found at Rivas's residence which traced back to **McGraw**, and *Figure 26* is a page of the ATF Form 4473 **McGraw** completed for that purchase.



*Figure 25*



*Figure 26*

48.    From November 2021 to July 2022, ATF is aware of at least twenty (20) firearms purchased by **McGraw** from an FFL. However, this number may be incomplete because it would not account for unrecovered firearms or firearms purchased from a private seller.

### D. Guadalupe Corona

49.    E-Trace results of boxes recovered from Rivas's residence showed two (2) Century Arms Draco style pistols, one (1) FN SCAR rifle, and three (3) Glock pistols were purchased by **Guadalupe Corona**. In addition to the empty boxes found at Rivas's residence, **Corona** purchased an additional fourteen firearms of similar makes and models in multiple sales from January 13, 2022, to June 1, 2022.

50.    On or about August 9, 2022, your affiant and an ATF SA conducted a recorded non-custodial interview of **Corona**. During the interview, **Corona** admitted to knowing Rivas, having met him through the online firearm marketplace Texasguntrader.com. When asked how many firearms he sold to or purchased for Rivas, **Corona** estimated seven or eight firearms. **Corona** admitted to purchasing all of the firearms whose boxes were recovered from Rivas's residence for Rivas, at the direction of Rivas, with money supplied by Rivas. **Corona** stated Rivas gave him $500 for purchasing the FN SCAR for him and $100-$150 for each of the Glock handguns he purchased for him.

51.    During separate proffer interviews with with Sotelo, the CD, and Rivas, each person identified **Corona** as a person who purchased firearms for Rivas. During the May 2023 interview with Rivas, Rivas identified **Corona** and said he purchased multiple firearms from **Corona**. Rivas said an unidentified third party would send **Corona** to buy firearms, **Corona** would then transfer the firearms to Rivas, and unknown persons would pick the firearms up from Rivas. This transfer of firearms was similar to how Rivas, **Garcia**, and **Carrizales** were conducting their transactions.

Criminal Complaint – Page 16

Rivas said he would meet with **Corona** at various gas stations to conduct the transaction. Eventually, Rivas, trying to make his own way, met **Corona** near a gun store in Mansfield, Texas and **Corona** purchased a SCAR rifle for Rivas.

52.    For each of the firearms and/or boxes recovered from Rivas's residence for which **Corona** was determined to be the purchaser, a review of the corresponding ATF Form 4473 showed **Corona** marked the box indicating he was the actual purchaser of the firearm, the firearm was not being purchased for someone else, and he signed the ATF Form 4473. *Figure 27* is a picture of a firearm box found at Rivas's residence which traced back to **Corona**, and *Figure 28* is a page of the ATF Form 4473 **Corona** completed for that purchase.



*Figure 27*

I certify that my answers in Section B are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 21.a. if I am not the actual transferee/buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 21.b. through 21.k. is prohibited from receiving or possessing a firearm. I understand that a person who answers "yes" to question 21.f.1. is prohibited from receiving or possessing a firearm, unless the person answers "yes" to question 21.f.2. and provides the documentation required in 26.d. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of Federal law.

| 22. Transferee's/Buyer's Signature | 23. Certification Date | | |
| --- | --- | --- | --- |
| | Month | Day | Year |

*Figure 28*

53.    From November 2021 to July 2022, ATF is aware of at least twenty-two (22) firearms purchased by **Corona** from an FFL. However, this number may be incomplete because it would not account for unrecovered firearms or firearms purchased from a private seller.

### E. Darryl Fox

54.    E-Trace results of boxes recovered from Rivas's residence showed five (5) Glock pistols were purchased by **Darryl Fox.** Two FN SCAR rifles were also purchased by **Fox,** but neither the box nor rifle was recovered from Rivas's residence.

55.    On or about August 8, 2022, your affiant and ATF SAs conducted a recorded non-custodial interview of **Fox. Fox** said he met Rivas on June 2, 2022, while he was walking to the medical facility to donate plasma. Rivas approached **Fox** while Rivas was driving a black SUV, and asked **Fox** if he wanted to make $1,000. Rivas drove **Fox** to at least three FFLs. Rivas gave **Fox** the money to purchase each firearm, and Rivas told **Fox** what firearm to purchase. At the end of their purchasing trip, Rivas paid **Fox** approximately $1,000. An ATF SA asked **Fox** if he

remembered question (21a) on ATF Form 4473, which asked if he was the actual purchaser. **Fox** acknowledged he did and acknowledged that he lied on the ATF Form 4473 because he purchased the firearms for Rivas.

56.    During the May 2023 interview with Rivas, Rivas identified **Fox** as an individual he asked to purchase firearms for him. Rivas said the above-described CD asked an unnamed friend to purchase firearms, and the unnamed friend connected the CD and Rivas with **Fox**. Rivas remembered driving **Fox** around on one occasion to purchase firearms from various FFLs around Fort Worth.

57.    For each of the firearms and/or boxes recovered from Rivas's residence for which **Fox** was determined to be the purchaser, a review of the corresponding ATF Form 4473 showed **Fox** marked the box indicating he was the actual purchaser of the firearm, the firearm was not being purchased for someone else, and he signed the ATF Form 4473. *Figure 29* is a picture of a firearm box found at Rivas's residence which traced back to **Fox**, and *Figure 30* is a page of the ATF Form 4473 **Fox** completed for that purchase.



*Figure 29*



*Figure 30*

58.    From September of 2021 through July of 2022, ATF is aware of at least seven (7) firearms purchased by **Fox** from an FFL. However, this number may be incomplete because it would not account for unrecovered firearms or firearms purchased from a private seller.

### F. Gavino Trujillo

59.    E-Trace results of boxes recovered from Rivas's residence showed four (4) FN SCAR rifles and one (1) Masterpiece Arms pistol were purchased by **Gavino Trujillo**.

60.    On or about August 2, 2022, your affiant and another ATF SA conducted a recorded, non-custodial interview of **Trujillo**. During the interview, **Trujillo** admitted to straw purchasing firearms for Rivas and at Rivas's direction and positively identified a single image of

Rivas. **Trujillo** stated Rivas supplied him with cash to purchase the firearms, and paid **Trujillo** approximately $300-$400 per firearm. When asked about Rivas's citizenship status, **Trujillo** stated he did not believe Rivas is a United States citizen. In addition to the firearms recovered at Rivas's residence, **Trujillo** said he sold Rivas two AR-15 style rifle, for approximately $1,000 per rifle. An ATF SA asked **Trujillo** if he remembered question (21a) on ATF Form 4473, which asked if he was the actual purchaser. **Trujillo** acknowledged he did and acknowledged that he lied on the ATF Form 4473 because he purchased the firearms for Rivas.

61.     During the May 2023, interview with Rivas, Rivas identified **Trujillo**, and said he purchased two FN SCAR rifles and two AR-15 style rifles for him.

62.     For each of the firearms and/or boxes recovered from Rivas's residence for which **Trujillo** was determined to be the purchaser, a review of the corresponding ATF Form 4473 showed **Trujillo** marked the box indicating he was the actual purchaser of the firearm, the firearm was not being purchased for someone else, and he signed the ATF Form 4473. *Figure 31* is a picture of a firearm box found at Rivas's residence which traced back to **Trujillo**, and *Figure 32* is a page of the ATF Form 4473 **Trujillo** completed for that purchase.



*Figure 31*

*Figure 32*

63.     From November 2021 to July 2022, ATF is aware of at least five (5) firearms purchased by **Trujillo** from an FFL. However, this number may be incomplete because it would not account for unrecovered firearms or firearms purchased from a private seller.

### G. Mario Lara

64.     On or about August 2, 2022, your affiant and another ATF SA conducted a recorded, non-custodial interview of **Mario Lara**. During the interview, **Lara** admitted to purchasing one FN SCAR rifle at Rivas's direction with money supplied by Rivas. **Lara** also admitted to selling Rivas **Lara's** personally owned Remington 1911 pistol. **Lara** said he previously saw "a lot" of a crystal substance in Rivas's residence.

65.    During the September of 2022 proffer interview with Sotelo, she confirmed she knew **Mario Lara**, and said **Lara** and Rivas were "best friends." Sotelo was aware **Lara** purchased an FN SCAR rifle from Range USA for Rivas. Sotelo did see **Lara** present in a room of the house with a large quantity of methamphetamine.

66.    During the May 2023 proffer with Rivas, Rivas identified **Lara**. Rivas said **Lara** did purchase one firearm for Rivas at Rivas's direction and **Lara** sold Rivas one of **Lara**'s personal pistols which Rivas still had in his possession on July 29, 2022. Your affiant confirmed with Rivas that he was talking about the 1911 style pistol found in Rivas's dresser drawer. Rivas said **Lara** was aware of the narcotics trafficking from the residence but did not participate in it.

67.    For the FN SCAR rifle box from Rivas's residence for which **Lara** was determined to be the purchaser, a review of the corresponding ATF Form 4473 showed **Lara** marked the box indicating he was the actual purchaser of the firearm, the firearm was not being purchased for someone else, and he signed the ATF Form 4473. *Figure 33* is a picture of a firearm box found at Rivas's residence which traced back to **Lara**, and *Figure 34* is a page of the ATF Form 4473 **Lara** completed for that purchase.

*Figure 33*



*Figure 34*

68.    The firearm mentioned in *Figure 33 and 34* is the same firearm for which **Lara** was observed on surveillance camera accompanied by Rivas, and the same firearm he overpaid for by $100 and had to return to the store to retrieve his $100.

### V. Conclusion

Based upon the above facts and circumstances, I submit there is probable cause to believe that defendants **Mario Lara**, **Kyron McGraw**, **Gavino Trujillo**, **Oralia Carrizales**, **Geovanny Garcia**, **Darryl Fox**, and **Guadalupe Corona**, conspired with each other and Jose Rivas-Chairez to violate 18 U.S.C. § 922(a)(6) by knowingly making false and fictitious material statements to licensed firearm dealers in connection with the acquisition of firearms, all in violation of 18 U.S.C. § 371 (18 U.S.C. § 922(a)(6)).

Kyle Medvetz
ATF Special Agent

SWORN AND SUBSCRIBED before me on August 22, 2023 at 1:24 am/pm, in Fort Worth, Texas.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

Criminal Complaint – Page 21